Good morning, Your Honor. May it please the Court, Caleb Mason for the defendant and appellant in this matter, Muhammad Ansari. I will keep track of my own time, but I'd like to reserve two minutes for rebuttal. Sure. This is a coerced confession case. That's what I want to focus on this morning. The briefing raises a couple other issues, and I'm happy to take questions on those. But I really want to focus on the statement and the admission of the statement. There are four separate reasons why reversal is required here. They are independent. If the Court agrees with the defense on any of those reasons, then reversal would be required. I'll lay out a little road map, and then I want to take them one at a time. The first is voluntariness. This confession was not voluntary. It was extracted through the improper use of threats and promises, specifically threats to put Mr. Ansari on a no-fly list and not let him fly again, talk to the airlines, make sure that he never got on a plane again, unless he simply said exactly what the agents wanted him to say, and they told him multiple times over two hours exactly what they wanted him to say. The transcript shows the agents telling him exactly what he had to say and the consequences if he didn't, and then promises, if you'd simply say what we're telling you to say, we will move along from this. We will resolve this today. In other words, we'll give you a warning, and the agents, in fact, used that term multiple times explicitly. Secondly, the second form of improper conduct that rendered this statement coerced was the use of extrinsic falsehoods. As we know, agents who are interrogating a subject can lie about things intrinsic to the facts of the case. An agent can say, we found your DNA on the crime scene somewhere, and that could be a complete lie, but that would not render a subsequent confession involuntary. By contrast, an extrinsic falsehood is when the agent lies about something extrinsic to the crime itself, and the classic example of this is a promise of leniency. If you simply tell us what we want you to say, simply confess, then you will get a warning, we will move along, and we will leave. We will be on our way. Leniency in exchange for a confession is the classic extrinsic falsehood, and the agents deployed that here. Second, we're still on the road map, is the rule of completeness discussion. This is the third? No, the first issue is voluntariness, and it has two subparts, the reasons why the statement was involuntary. The second general issue is the rule of completeness. I'm calling it the rule of completeness, and obviously this is in the rules of evidence at 106, but I think under Kentucky v. Crane, this is also of constitutional dimensions, it goes to the core right of a defendant to challenge the reliability and credibility of a confession or other statement introduced against him. So, the rule of completeness argument is, if the government was going to put in part of this statement, then the whole thing should come in. The defense made this motion, asked for the entire thing to come in, we had lengthy argument on this, and ultimately the district court denied that motion, and directed the defense to provide snippets, excerpts, and then did not even allow all of those excerpts in. What were you proposing? Were you proposing to play the entire recording for the jury, or you just wanted the whole transcript to go in as an exhibit, and the jury can decide what to look at? Yeah, I wanted the entire recording to go in as an exhibit, to be published to the jury, played, the full two hours plus. I would have done that if permitted, and I would have simply admitted the recording and played excerpts if that had been an option as well, and let the jury listen to it on their own. But you would have played excerpts, you wouldn't have had the jury sit through the whole two plus hours, would you? Your Honor, if the judge had let me do that, I would have done it. I would have played the entire thing, and I'll tell you why. Listening to that entire recording, I imagine the court has done. To me, listening to it, it's pretty dramatic and demonstrative of the extent to which the ultimate statement that was introduced as a confession was coerced, was not voluntary. And indeed, in the discussion with the district court, in the hearing on, this was April 14th, the hearing on the motion to eliminate to admit the entire thing, the district court said this. The district court said, well, come on, I've listened to it, and it goes on and on and on for hours of denials. Why does the jury need to hear that? It's just duplicative. Your client is simply denying that he did this for hours. They don't need to hear that. That's duplicative. I mean, I think it's true that he went on for hours denying engaging in this conduct. That is true. He did, and that's precisely why the jury needed to hear it. The statement was introduced by the government in snippets, little tiny excerpts of phrases that the government then claimed were a confession and proved the defendant's guilt. The jury did not get to hear the full two plus hours of him being browbeaten by three agents with two other officers standing behind him in which he consistently said, I did not do this. I was asleep. And the agent said, keep telling us that, pal, and you're never going to fly again. We're going to put you on a no-fly list. We're going to call the airlines. You will never fly again. We know what happened. We know what happened. We know you did it. Just tell us exactly what we're telling you to say. I think the effect on any trier of fact of hearing the entire thing, I would have introduced the transcript as well, but I understand that was... Introduced even the parts where your client apparently lied. He said, oh, I was passed out. I was not conscious during this flight. I never got anything to drink. And then later he said, well, okay, I might have been awake for some portion. I did ask for milk tea. All of it, Your Honor. I guess the whole transcript itself is not completely favorable to your client, even separate from the confession. The entirety of the interview, yeah. It includes him first saying, I didn't order a tea, and then saying I ordered a tea. I don't think a jury would have convicted because of that. What the jury needed to hear was that he sat there for the first, I mean, it's 150 pages of transcript, but we'd be talking about the recording, which was the original evidence, for two hours, consistently denying having engaged in any kind of intentional touching of the passenger next to him. And it was... Part of that was, I was passed out, so I didn't touch her, because I wasn't conscious. I was asleep the entire flight. That wasn't true, right? That does go to whether he, in fact... Part of the statement was, I was asleep the entire flight, and then he was asked, well, didn't you order a drink? And he said, yeah, I guess I ordered a tea, right? I mean, but that's... Yes. In answer to the court's question, the direct answer is yes. I wanted the entire listening to that entire recording could have, a reasonable jury could have, deemed the ultimate inculpatory statements to be non-voluntary, because of the length of time and the brow-beating and the threats and the promises and the extrinsic falsehoods. Just tell us what we want you to say, and you'll walk out of here with a warning. I do think that. The third issue, now, is related to the rule of completeness. And that is a defendant's right to challenge the credibility and reliability of a statement. This right is, you know, the seminal place we look at it is Kentucky v. Crane, which is discussed in the briefing. That is a constitutional right to put on a defense, to challenge the reliability and credibility of a statement introduced against the defendant. How do you do that? There are multiple ways of doing it. One of the ways was the rule of completeness argument. You simply put in the whole statement. Now, the second way that you could do this, which we also tried, was to use expert testimony. And the defense had two experts. One of them was Dr. Richard Romanoff, who is a psychologist. The other one is Dr. Richard Leo, who is a Ph.D. sociologist and law professor. Dr. Romanoff was prepared to testify about Mr. Ansari's mental state, his mental illness, his trauma from growing up under a military dictatorship and the particular fear of police and law enforcement that that created in him, and the effect that such early trauma would have on a person interacting with law enforcement in an interrogation context. This was the first time that Mr. Ansari had been questioned by law enforcement since he and his family fled Pakistan after his friends were killed, shot during a political demonstration in front of him. And he testified to that narrative at trial. But he was not permitted to put on a psychologist, Dr. Romanoff, to testify to how that experience would affect your interactions with law enforcement. Dr. Romanoff's testimony would have gone directly to the core constitutional right articulated in Crane to challenge the reliability and credibility of a statement being introduced against you as a confession. The second expert was Dr. Richard Leo. And Dr. Richard Leo is one of the nation's foremost experts on false confessions. He has studied this empirically. He has testified as an expert in dozens of trials. All of these materials were properly noticed to the government, presented to the district court, and the district court did not permit him to testify. The primary reason the district court gave was that he did not consider social science to be real science and he did not think that Dr. Leo really met the Daubert test as being sufficiently scientifically reliable. I think that holding should be reversed. An expert who has studied false confessions, the reasons they occur, the fact that they occur, is of critical importance in any jury trial where the defendant is alleging that the confession is false. And the reasons given for that are set forth in the brief and have been... Let me ask you with Dr. Leo, if it was error to exclude it, why was the error not harmless based on all the evidence? The government expressly conceded, and this is in page 58, note 18 of the government's brief, the red brief, you'll find that footnote at the bottom of that page, that if there was any error in the introduction of the statement, that error was not harmless. That's the government's position and the government is correct to take that position. Their whole case was this statement. Of Dr. Leo, or are you talking about the confession? I am talking about the admission of the confession. Oh, no, I'm asking you a separate question. Yeah. I'm asking about Dr. Leo. Why is that not harmless error based on all the other evidence? Because the confession was the heart of the government's case and the defense had a right to contest its reliability and credibility. And absent that right, you have a jury. And let's talk about what harmless error means. How likely is it that a jury, having seen the evidence that we wanted to put in and were prevented from putting in, how likely is it that a jury would have come up with the same guilty verdict? And the reasons why courts have said consistently that false confession evidence is important and admissible is that juries come into a court without an understanding of the existence, the reality, or the reasons for false confessions. A lay jury comes into a courtroom, sits there in the jury box, and hears a statement that sounds inculpatory. And to them, they will ask the question, as we quoted multiple cases saying in the briefs, why would anybody confess to something they didn't actually do? That question is going to leap out of the consciousness of any lay juror. And they're going to ask themselves that. And that's why it's so important that the defense be able to put on an expert to say, yes, false confessions do occur. And here are the reasons they occur. Here are some of the documented instances in which they occur. Here are some of the techniques that tend to produce them. So, counsel, quick question. On Dr. Leo's testimony, I think the district court also excluded it under 403. Yes, Your Honor. What's your response to that? I don't think that there's any 403 basis here. I mean, the 403 test is, you know, is the evidence substantially more prejudicial than probative. I mean, I don't see any prejudice here. There's the other part of it. Now, the district court did not articulate this, but I want to give you a chance to respond. The other parts of 403, that it's a waste of time or it's a sideshow. Can you talk about that? I would disagree with that. And I think the court could disagree with that just on the face of the papers. There was no cumulativeness or waste of time. This was a short trial. Dr. Leo's testimony would have been false confessions are real. Here is the general statistical prevalence that we have been able to identify through actual cases. Here are the reasons that are associated with them. Here are the interrogation techniques that tend to produce them. That's what he would have testified to. That would not take that long. I've pretty much just done it. So I don't think that there's any waste of time. I would agree with Romanoff. That does sound cumulative because what you just said that Mr. Ansari testified to about his trauma, about being in Pakistan, observing other people dealing with law enforcement. But you said basically Romanoff would basically testify to the same kind of self-serving hearsay. I don't know how we can find abuse of discretion on that one. Your Honor, this court's case law actually goes the other way. And the case law suggests that if you're going to put on a false confessions expert like Dr. Leo, you must also call an expert witness to talk about the specific psychological propensity of your defendant, your client, to give a false confession. In other words, you have to connect the two. And you cannot do both of those through the same expert. You need one expert to talk about false confessions generally. And then you need a second one to talk about the particular psychological circumstances of this case. So I would disagree with the court. I think we needed both. And they were not cumulative. They talked about very different topics. For the last 20 seconds, if I could also mention the request for counsel issue, the Sixth Amendment invocation claim. I think this one is very important. It's a question of law. The court can decide it simply based on the transcript. The agent says to him, this is going on your record no matter what. Mr. Ansari says, if it's going on my record, then I need a lawyer. That is an unambiguous invocation of counsel. The agent has already supplied the antecedent condition. And the defendant says, if it's going on my record, I need a lawyer. The analogy is, you tell me. If my time is up, I better stop. There you go. All right. We'll give you two minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. James Santiago, appearing on behalf of the United States of America. The trial was fair. The defense had its opportunity to present its theory of the case, and the jury rejected that. Two separate district courts evaluated the defense arguments, and their ruling should be affirmed. The center of the case, the heart of the government's case, as acknowledged in the closing argument and in the rebuttal, was the precipient witness testimony. The testimony of two flight attendants, the testimony of the victim, and the testimony of a passenger who sat in the very same row and saw the crime actually happening. The defendant's interview was voluntary when looking at the totality of the circumstances. He was a 47-year-old businessman with extensive travel and a waiver of his Miranda rights, both orally and in writing. It was in a public setting, and his will was not overborne when looking at the totality of the circumstances. And defendants' cherry-picked statements do nothing to change the fact that the agents were professional in their dealings with him, and they're dealing with a defendant who one of the courts described after reviewing the entire transcript as being evasive, misleading, and dishonest, and he was the one who caused the interview to drag on for two-and-a-half hours, not the agents. The defendant's story changed. He'd give a little bit, he'd walk it back a little bit, gradually remembering things, and remembering things you can't remember if you are in fact asleep. His story changed. Furthermore, with regards to the rest of defendants' arguments, all the remaining arguments, there was no abuse of discretion by the district court in its rulings. The district court provided defense the opportunity to introduce 11 excerpts of the interview as opposed to all two-and-a-half hours of the interview. The recording itself is the evidence and not necessarily the transcript. And even over the government's hearsay objections to introducing those full two-and-a-half hours of self-serving statements, the defense had this opportunity to present its theory of the case. Being able to argue, and as the district court said, it was a matter of degree. There had to be enough there for the defendant in the event he testified or did not testify to make that argument. And that's the argument that defense made throughout the entire case. Regarding the experts, the defense noticed three experts. One of them was let in. Being able to speak about sleep in general. The other two experts were properly excluded by the district court using its discretion and acting as its gatekeeper. Their testimony would have been unreliable. Relying on its subjective interpretation. Mental health diagnoses are ever relevant to a voluntarianist's analysis? Yes, Your Honor. It is a totality of the circumstances. And you have to take the... There's no... It's not necessarily... Wouldn't the diagnoses here not be relevant to whether he voluntarily confessed? Well, obviously, Your Honor, they are relevant and they were able to present that theory to the case. The defendant did testify, but what the agents know, they know he's a 47-year-old man, public setting, and he agreed to an interview. Looking at the totality of the circumstances, he did say in the interview that he does travel for work. So yes, it is taken into account, but that is not the only factor. There are all the other factors regarding the voluntariness of the interview that the court has to weigh and not just tick off checkboxes, which I think is what the Preston case that the district court referenced in the Preston... Then Romanoff testifies to the, you know, bipolarity and the depression and the anxiety. If you're saying it's relevant, then why shouldn't it have been admitted? Just because it's relevant, Your Honor, does not mean it's necessarily admitted. Under 403, it would have been just cumulative evidence bolstering defendant's inadmissible hearsay testimony. They were able to get that out, saying his experience in Pakistan, and it was very prejudicial to an extent, but he was able to still tell that story. So with that, weighing everything, Your Honor, not just... Psychologists would add some things different, right, than Mr. Ansari himself. A psychologist could make the connection with being, you know, so anxious that you're going to just give law enforcement what they want so you can end this. But not enough that... I'm sorry, Your Honor. But not enough that it would have made any difference, Your Honor. They were excluded, and the district court did use its discretion and properly excluded them because it would have been cumulative evidence. It was more prejudicial than anything else. Raising in all those experiences, all his traumatic background, which the government is sympathetic to, but really doesn't have... It is not the controlling factor in the voluntariness argument. But counsel, let me just ask this devil's advocate here. So if my kid comes to me and says, well, I'm really having a bad day at school, that's my kid telling me. If a psychologist comes to me and says, your kid had a really bad day at school, okay, now I'm taking that a little more seriously. Couldn't... Isn't there a possibility the jury could have seen, because you had the testimony of an expert, saying, yeah, this guy really does have all these problems, that the jury may have taken more from that? It can, Your Honor, but I don't think that's necessarily a fair comparison. When you're dealing with your child who's coming to you with problems, you recognize that as a child. Here we have a grown man, 47 years old, who tells agents he travels extensively for work, that he's a consultant for companies, and he travels all over the countries. This is a sophisticated individual, and in the agents, when they're interviewed with him, they asked him the questions before they read them, as Miranda writes. Are you taking any medications? They observed his demeanor. And Special Agent Rickow's declaration, they noted that, that he didn't appear to be suffering from any sort of ailments. And to be asking agents on the spot to be diagnosing people when they're responding, trying to triage the situation, I don't think is necessarily appropriate. Now here, as it replies to the expert, going back to, it would have violated 403, as Your Honor, when you asked the question of the appellant earlier. It would have been cumulative. But regarding the question of whether or not, like, yes, in some cases it does make sense, but not necessarily here. And the district court appropriately uses its discretion in excluding those experts. Moving on, just regarding the rule of completeness, I already briefly touched on this. Two and a half hours, the recording itself is the evidence, as opposed to the transcript. Defendant did get those 11 experts in over the government's hearsay objections. Now regarding the invocation of counsel, the Davis case is directly on point. And this case, the Davis case, Supreme Court case, post-states the Ninth Circuit case that defense cites in their papers regarding some doctrine of conditional invocation. There is no such thing. Davis establishes that bright line rule. There has to be an unambiguous request. Now the majority of the government's ... I think a conditional invocation can never be sufficient under Davis? Under the current, like, I don't want to make, certainly, make a bright line rule. It's conditional, but the agent knows the condition is satisfied. They, the agents were confused on the spot, Your Honor. I'm sorry? The agents were confused about whether or not he was doing ... Right. Okay. Let's not talk about Mr. Ansari. I just want to understand your position. If it's conditional, but the agents know whether the condition is satisfied or not, is that enough under Davis? I think it depends. It depends on how clear and convincing or how clear and unambiguous that invocation is and whether or not ... It could be. It could be. There's no bright line. Because I, the way you said it almost sounded like conditional invocations don't, you know, ever satisfy Davis. No. I could envision scenarios ... If it's clear and ambiguous. Yes. Clear and unambiguous. Is there anything conditional about what the agent said to him? It's going to go on your record? But, like, he said that and he wanted to clarify, like, what does that mean? And there was a back and forth of four people talking at the time. And in their mind is, hey, this is a guy who already waived his rights, orally and in writing, and now he's not clearly invoking. What is he doing? He's asking us for legal advice. He asked them multiple times, should I get a lawyer? The Davis case is directly on point. It post-states the 9th Street case that ... He didn't say, should I get a lawyer. He didn't ask that question. He said, I mean, is it going to be on my record? Because then I need to get a lawyer. But then he asked, what should I do after that? Multiple times, Your Honor. He asked them multiple times, yes, I know, I understand. But I'm asking you guys, what do I do? That is not a clear invocation. And that is not a point where necessarily it would, like, raise the agent's awareness. And as the Davis case explains, agents aren't required to ask clarifying questions. That's the bright line law. Miranda is the protection at the front. And even the Davis case acknowledges there are times when various defendants could be put at a disadvantage, whether or not because of linguistic barriers, things to that nature. But the agent should not be put in a position where they have to, like, give legal advice. And that is what he was doing here, Your Honor. And so your take is, for example, on ER-1151, Judge Bea read you the passage about going on the record. And then when he then says, I know, should I get a lawyer, you have to read those in combination. You can't just read the one statement. You have to read the second statement where he's, in a sense, still leaving it up in the air whether he wants a lawyer. You do have to look at all of it, Your Honor, just to give it context. Because just parsing it out, it is difficult. And there was some equivocation there. But at the end of the day, the agents weren't sure what he was doing. And it was ambiguous. With that, Your Honors, all I'd like to close with is. Let me ask you one more question.  So the officers couldn't have threatened that a court or a prosecutor would treat Mr. Ansari more harshly if he chose to remain silent. So why are the threats about putting someone on a no-fly list when they fly for a living, why aren't those equivalent? How can we distinguish that? They're not necessarily threats, Your Honor. They are responding to a situation. And yes, I mean, when looking at some of the other cases, but looking at the totality of circumstances, just because there are some arguably coercive questions does not make the interview involuntary. This case is nothing in comparison to the case of Hernandez v. Dukart, which is highlighted in the government's answering brief. In that case, I believe it was a 17-year-old who was accused of shooting some, whether or not he was involved with the shooting. And his- You're saying sometimes suggestion that you're going to be treated more harshly is okay if overall it's not so coercive. I mean, it sounds like you're saying a little bit is okay. A little bit of suggestion that you're going to be treated more harshly is okay. It depends on who you're dealing with and how reluctant they are being. This case, the questions they were asking is nothing in comparison to that case I just referenced, which was held up by this court in a subsequent ruling. It started off with a magistrate recommendation that was adopted, and then the Ninth Circuit upheld that case because any coercion that was there, to the extent there was some, which is much more extreme in comparison to the case at hand, was too attenuated. He was already giving confessions throughout the entire interview before any of that stuff came up. And in this case, the agents were doing their job. In which case? The case you're talking about or in Mr. Ansari? In Mr. Ansari's case. The case I referenced, Hernandez v. Dukart, that case was about a gang member pressuring him like, hey, you better own up to this. We want to know, they called him out for being a liar. We know you weren't there. You better write an apology for this. It's going to only get worse for this. We're going to start knocking on doors of all your homies. And they were just putting a lot of fear in him. And that was a young man. That is not what we have here. We have a grown man who was evasive for an hour and a half, two hours, changing his story. And agents are saying what they literally have to do. Like, they don't know what's going on. They responded knowing nothing about the case. They know that a woman woke up, had a hand. But coercion is okay if you're sophisticated and older? I'm sorry, I just don't know where the, how do we draw the line? How do we draw the line? I don't think you can necessarily draw a line, Your Honor. I think you have to look at the totality of the circumstances. And the circumstances here, yes, the agents did have to apply a little bit of pressure. But it's because they were responding to somebody who was being misleading and deceptive and clearly not being honest with them. So their statements, in comparison to other cases where this court has held that those statements were voluntary, were not coercive. Nowhere near the same degree. They were triaging a situation. They knew they had a difficult person that they were interviewing. And what they do have to do is they have to react immediately. Like, oh, we have a guy who travels all the time and he can't control himself. We have to let these airlines know. And they were just stating the position that they were in. So I do not believe that their statements were coercive, Your Honor. But it sounds like, I'm sorry. I was gonna say, I think where the confusion may lie here is that there may be some coercion. The question is, is it unduly coercive? And agents are allowed to push. The question is, in this case, did they push too far? And did they overbear the will of this man? And I think I understand your argument is that in this case, even though there was some pushing by the agents, if you look at the totality of the circumstances, your positions, he was not pushed too far. Correct, Your Honor. What I was gonna say, and thank you for pointing that out, his will was not overborn. Coercion, the Preston case, which the lower court already did this analysis, looking at the read factors, the read interrogations, ticked off all those factors and given in light of all the totality of circumstances, his will was not overborn. But we have to look at it then over, right? Yes, Your Honor, for the voluntariness. Unless the court has any further questions, the government would ask that the court affirm and the government would submit. All right, thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. Your Honor, I have taken notes and will try to address several of the points made in order. I would like to start with the claim that one of the first comments the government made, the heart of this case was percipient witness testimony, I guess, as opposed to the defendant's statement. I think that one is hard to take seriously if we look at the evidence in the case and the government's own closing argument, which focused almost entirely on the statement. He said it, he said it, he said it. The government said that a dozen times in closing, focused on the statement. Absent the defendant's statement, what you have is a victim who says she woke up and his hand was on her thigh. That was never disputed, that his hand was on the thigh. You have a passenger seated in the next seat over who says he saw the hand on the thigh. That was never disputed, and then. Oh, I thought he saw the hand for an hour. Yes. And buried in her crotch. So I guess that's pretty persuasive evidence, isn't it? As to where the hand was? Watching it for an hour and then also saying he wakes, Mr. Ansari wakes up and looks around and you have two flight attendants saying he's pretending to be sleeping. We also presented five witnesses who were seated in all the adjoining seats who said they saw and heard nothing unusual at all, which directly contradicts the victim's own statement about her reaction when she woke up. My point is just this case stands and falls on that confession. And I don't think the court could properly rule that the admission of the confession was harmless in light of the other evidence. The other thing is what I really wanna focus on. The government said then, and on the invocation issue, after saying, if it's going on my record, I want a lawyer, the government said, well, then he asked later more questions, what should I do? But you all know the rule of a Sixth Amendment invocation of counsel. You have to stop asking questions. When a person invokes, you stop. You don't then get to keep questioning to see if you can elicit some more statements that you can then say were simply questions. And if you listen to this recording, it is really dramatic. After two hours of peppering him without respite, the moment he says, is this going on my record because then I want a lawyer, there are five full seconds of silence. All the agents stop because they know he just invoked. They know it, they can hear it. A jury would have heard it too. When a person invokes, you must stop. You do not get to keep asking questions to generate a record that the prosecutor can then say creates equivocation or ambiguity. And that is exactly what happened here. I am over time. If the court has any questions for me, I obviously have other thoughts. All right. Thank you, counsel, appreciate it. Thank you, your honor. Thank you both for your briefing and argument in this interesting case. This matter is submitted.
judges: BEA, OWENS, KOH